Filed 8/18/25  P. v. Molina CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY MOLINA III,<br><br>    Defendant and Appellant. | 2d Crim. No. B333086<br>(Super. Ct. No. 21CR00147)<br>(Santa Barbara County) |

Robert Anthony Molina III appeals the judgment entered after a jury convicted him of the second-degree murder (Pen. Code, § 187, subd. (a))[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1)).  The jury also found true the allegation that appellant personally and intentionally discharged a firearm in causing the victim's death (§ 12022.53, subd. (d)).  In a

---

[1] All undesignated statutory references are to the Penal Code, unless otherwise noted.

bifurcated proceeding, the trial court found true allegations that appellant had suffered a prior serious felony and strike conviction (§§ 667, subds. (a), (d) & (e), 1170.12, subds. (b) & (c)). The trial court sentenced him to an aggregate term of 55 years to life plus 9 years. Appellant raises claims of evidentiary, prosecutorial, instructional, and cumulative error. We affirm.

*Facts*

On January 2, 2021, victim Kevin Najarro was living in Santa Maria with his friend Brian Miller in one of two detached garages (the east and west garages) on the property where Brian's[2] parents Luana and Charles Miller also lived. Najarro, Brian, and others often used drugs together in both garages.

That afternoon, neighbors' video surveillance cameras recorded appellant—who was known as "Skills"—arriving at the property wearing black and white checkered shorts and Nike shoes with one red toe and one blue toe. Christina Reyes testified that she drove to the property that same day with a man named Elmer. Reyes went into the west garage and played dice with appellant, Najarro, and two other individuals named Miguel and Linda while they all smoked methamphetamine. Several other people also entered and left the garage while Reyes was there. When she left the garage that evening, only appellant and Najarro remained; Brian was in the main residence eating dinner with Luana and Charles.

As Reyes was getting into her car across the street, she heard gunshots and hid in nearby bushes. Neighbors' video surveillance cameras recorded the sound of four gunshots at 7:21 p.m., then showed appellant leaving the area 11 seconds later

---

[2] Because Brian, Luana, and Charles have the same last name, we refer to them by their first names for clarity.

carrying a bi-colored blue and silver revolver.  Appellant is also seen rubbing the revolver on the right front part of his shorts.

Reyes testified that she saw Elmer in the street after she heard the gunshots, but previously told a detective that she saw Elmer before the gunshots.  According to Reyes, she hid in the bushes for three to five minutes and then drove away.

Shortly before the gunshots, Luana and Brian had finished eating dinner.  When Brian opened the front door to go outside, Luana heard a "scraping banging noise" on the side of the house.  Luana went outside and saw a car parked across the street.  A woman "came out" and was walking toward the garages and said "'Kevin is hurt.'"  Another woman was also in the yard by the garages. Luana looked inside the west garage, saw a pool of blood on the floor, and called 911.

The police arrived and found Najarro's body on a mattress in the east garage.  Najarro had gunshot wounds to his neck, right arm, chest, and left thigh.  Three of the bullets were .22-caliber and the fourth was too damaged to determine the caliber.  In the west garage there was a pool of blood and a backpack that had apparently been rummaged through, and narcotics bindles were strewn on the floor.  There was also smeared blood and droplets of blood on the pathway between the garages.  The police subsequently determined that Najarro had been shot in the west garage.

When appellant was arrested at his mother's house a few days later, he was wearing the same black and white checkered shorts under a pair of jeans.  Inside the house the police found a .22-caliber blue and silver revolver frame, a .22-caliber revolver cylinder, and .22-caliber ammunition.  In appellant's car which was parked nearby, officers found four .22-caliber spent shell

3

casings in the driver's side door handle, a metal rod consistent with a revolver's cylinder retaining pin, over 50 live .22-caliber rounds of ammunition, and a pair of Nike shoes with one red toe and one blue toe. It was subsequently determined that at least three of the spent shell casings were fired from the revolver cylinder found in appellant's mother's house.

After appellant's arrest, samples were taken from his hands and shorts and tested for gunshot residue (GSR). Particles "characteristic of GSR" contain the elements of lead, antimony, and barium. Particles containing only two of the three elements are termed "consistent with GSR," while particles containing only one of the elements are "commonly associated with GSR." Two particles consistent with GSR and five particles commonly associated with GSR were found in the sample taken from the right-front side of appellant's shorts. No particles characteristic of, consistent with, or commonly associated with GSR were found in the samples from appellant's hands.

In a recorded jail call between appellant and his mother five days after the murder, appellant said he "got a new charge." Appellant's mother asked "was there anybody around" and appellant responded "no." Appellant's mother then stated "they obviously don't have no witnesses or whatever. So I don't know how they charge you with anything." Appellant replied, "Oh, I know. I don't know either."

*Discussion*

*I.*

*GSR Evidence*

Appellant contends the evidence that particles consistent or commonly associated with GSR were found on the shorts he was

4

wearing the night of the murder should have been excluded under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).  We disagree.

Under California law, the *Kelly* test governs "the admission of expert testimony regarding new scientific methodology . . . ." (*People v. Leahy* (1994) 8 Cal.4th 587, 591.)  Under that test, the proponent of such evidence must establish: (1) the new methodology is reliable by showing it has gained general acceptance in the relevant scientific community; (2) the witness furnishing the testimony is qualified as an expert to give an opinion on the subject; and (3) the individual performing the test used the correct scientific procedures.  (*Kelly*, *supra*, 17 Cal.3d at p. 30.)  This test "is applicable only to 'new scientific techniques,'" that is, "'to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.'" (*Leahy*, *supra*, at p. 605.)  "[O]nce a trial court has admitted evidence based on a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Kelly*, *supra,* at p. 32.)

In *People v. Palmer* (1978) 80 Cal.App.3d 239 (*Palmer*), the court recognized that the scientific community had "uniformly embraced" the technique of using a scanning electron microscope (SEM) to observe and identify GSR particles.  (*Id.* at p. 252.)  This is the same technique used to observe and identify the particles found on appellant's shorts.

Appellant nevertheless asserts as he did below that *Palmer* is not controlling here because (1) "the relevant scientific community does not accept GSR evidence as reliable without

adequate preservation and collection protocols;" (2) "the relevant scientific community does not accept as reliable GSR samples submitted for testing more than 12 hours after a shooting;" and (3) "[t]he relevant scientific community does not accept GSR as reliable evidence in the absence of control samples to determine the origin of that evidence." (Bold omitted.) He further asserts that the evidence of particles consistent or commonly associated with GSR that were found on his shorts should have been excluded under *Kelly* "because the prosecution failed to prove that it observed protocols in this case." (Bold omitted.) None of these assertions are persuasive.

As the trial court correctly found in denying appellant's motion to exclude the GSR evidence under *Kelly*, his assertions go to the weight to be accorded the evidence rather than its admissibility. Appellant does not dispute the scientific reliability of the SEM technique itself, which was plainly employed here. The evidence establishes that samples were obtained from appellant's shorts after the shorts were collected from him and that an SEM was used to observe and identify particles on those samples that are consistent or commonly associated with GSR. As the People aptly put it, "[a]t most, appellant establishes a conflict within the law enforcement community as to [the] best practices for obtaining samples and minimizing the risk of contamination."

The lack of control samples, any delay in collecting samples, or the possibility that observed GSR particles were the result of contamination rather than the discharging of a firearm do not undermine the reliability of SEM's ability to detect such particles. (See *Palmer*, *supra*, 80 Cal.App.3d at p. 253 [recognizing that the lack of control samples or the potential for

6

contamination of tested samples "do not attack the SEM technique, but instead raise the possibility of error, which possibility goes to the weight accorded the evidence rather than its admissibility"].) Accordingly, appellant fails to establish that the challenged evidence should have been excluded under *Kelly*.[3]

To the extent appellant alternatively contends the evidence should have been excluded on foundational, chain of custody, and relevancy grounds independent of *Kelly*, we agree with the People that these contentions are forfeited because they were not raised below. (*People v. Fuiava* (2012) 53 Cal.4th 622, 671.) In any event, these evidentiary challenges lack merit. The testimony of the technician who collected and tested the samples from appellant's shorts was sufficient to make a foundational showing for the evidence. Contrary to appellant's claim, the authenticity of the evidence for purposes of admissibility was not contingent upon a showing that the GSR particles found on appellant's shorts were not transferred to the shorts after he was arrested.

---

[3] As support for his *Kelly* claim, appellant filed a request for judicial notice of five documents. We previously granted his unopposed request for judicial notice of two scientific articles (Exhs. (A) & (B)), but deferred ruling on his request for judicial notice of three other documents pursuant to the People's opposition (Exhs. (C), (D) & (E)). We agree with the People that those documents—two newspaper articles and the criminalist's gunshot residue report—are not matters properly subject to judicial notice under Evidence Code sections 452 and 459 and rule 8.252 of the California Rules of Court. Accordingly, we deny appellant's request for judicial notice of Exhibits C, D, and E. In any event, nothing in those exhibits (or the two exhibits for which judicial notice was granted) indicates that the SEM technique employed in this case no longer has general acceptance in the relevant scientific community.

7

(See *People v. Flinner* (2020) 10 Cal.5th 686, 727, citation omitted [""'[t]he fact conflicting inferences can be drawn regarding authenticity goes to the [evidence's] weight . . . , not its admissibility"""].)

Appellant's challenge to the chain of custody is similarly unavailing. *People v. Jimenez* (2008) 165 Cal.App.4th 75, which he offers for support, is plainly inapposite. In that case, there was an insufficient showing that the chain of custody had been maintained *after* the challenged evidence was collected. (*Id.* at p. 81.) Here, appellant complains that the particles found on his shorts may have been transferred to the shorts *before* they were collected from him. This complaint does not allege any break in the chain of custody.

Appellant's claim that the GSR evidence should have been excluded as irrelevant also fails. Although he notes that the prosecution's criminalist was unable to conclude from that evidence that appellant had handled a firearm, this testimony did not render the evidence irrelevant. Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact." (Evid. Code, § 210.) "This definition of relevant evidence is manifestly broad. Evidence is relevant when no matter how weak it is it tends to prove a disputed issue." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.) Evidence can be excluded as irrelevant only if it has *no* tendency to prove a disputed fact. (See *People v. Burgener* (1986) 41 Cal.3d 505, 527 (*Burgener*), disapproved on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743.)

Even though the criminalist could not conclusively opine from the GSR evidence alone that appellant had fired a gun or even handled one, when considered under the totality of the

circumstances the evidence had some tendency to prove both points.  (See *Burgener*, *supra,* 41 Cal.3d at p. 527 [concluding that "the presence of a substance which might be blood on a defendant's shoes  certainly has *some* tendency in reason to prove that he might have been present at the scene of a bloody shooting" even though "human blood, animal blood, some vegetable enzymes and fecal material could have produced this [test] result"].)  Only 11 seconds after Najarro was shot 4 times with a .22-caliber firearm, appellant is seen leaving the property holding a blue and silver .22-caliber firearm and rubbing it on his shorts in the exact spot where the particles consistent or commonly associated with GSR were subsequently found.  And after appellant's arrest, the police found the components of a blue and silver .22-caliber revolver and 4 expended shell casings. Accordingly, the trial court did not abuse its discretion in finding the GSR evidence was relevant to prove that appellant was the shooter.  (See *People v. Chatman* (2006) 38 Cal.4th 344, 371, [recognizing that "[t]he trial court has wide discretion in determining relevance"].)

Even if appellant could establish the GSR evidence should have been excluded on any of the asserted grounds, his claim would fail for lack of prejudice.  His attempt to frame the alleged error as one of constitutional magnitude is unavailing.  *Kelly* error and the other alleged evidentiary errors are reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Schultz* (2020) 10 Cal.5th 623, 661 [*Kelly* error] (*Schultz*); *People v. Harris* (2005) 37 Cal.4th 310, 336 (*Harris*) [state evidentiary errors].)  Accordingly, reversal would not be warranted unless it is reasonably probable that appellant would

9

have achieved a more favorable result had the GSR evidence been excluded.  (*Watson*, *supra*, at p. 836.)

Appellant fails to make such a showing.  By his own account, the GSR evidence admitted at his trial was "exceedingly weak[.]"  Only two particles consistent with GSR (lead and antimony) and five particles commonly associated with GSR (either lead or antimony) were found on his shorts.  No particles characteristic of GSR were found on the shorts, nor were any particles whatsoever found on his hands.  The criminalist admitted that "two particles alone are not indicative of [appellant having fired or] handled a firearm."  The jury also heard the criminalist admit that the limited particles found on appellant's shorts could have been transferred from various other sources he may have come into contact with after he was arrested.  Appellant's attorney vigorously cross-examined the criminalist on these points.

Moreover, the independent evidence of appellant's guilt was strong.  Reyes testified that when she left the garage on the night of the murder, only appellant and Najarro were still present.  Shortly thereafter, Najarro was shot four times with a .22-caliber handgun.  Eleven seconds later, a neighbor's video surveillance cameras captured appellant—who had just been alone with Najarro—leaving the property carrying a blue and silver revolver.  And when appellant was arrested a few days later at his mother's house, the police found a blue and silver .22-caliber revolver frame, a .22-caliber cylinder, and .22-caliber ammunition.  Four .22-caliber spent shell casings were also found in his car, at least three of which were fired from the cylinder found in his mother's home.  Appellant also made an adoptive admission of his guilt during a phone call with his mother after

10

his arrest.  In light of this evidence, it is not reasonably probable that appellant would have achieved a more favorable result had the GSR evidence been excluded.  Accordingly, any error in admitting the evidence was harmless.  (*Schultz, supra,* 10 Cal.5th at p. 661; *Harris, supra,* 37 Cal.4th at p. 336.)  In light of this conclusion, appellant's contention that the evidence should have been excluded as more prejudicial than probative (Evid. Code, § 352) also fails.  (*People v. Hin* (2025) 17 Cal.5th 401, 471, 482.)

## II.

### *Prosecutorial Error*

Appellant next contends that the prosecutor prejudicially erred[4] by "repeatedly mischaracteriz[ing]" the GSR evidence during closing argument.  We conclude otherwise.

Claims of prosecutorial error are subject to federal and state standards of review.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.)  The federal Constitution is violated when the prosecutorial error infects the trial with such a degree of unfairness as to render defendant's conviction a denial of due process.  (*Ibid.*; *People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).)  Prosecutorial error involving comments by prosecutors to jurors has generally been viewed by California courts as error of less than constitutional magnitude (see *People v. Bolton* (1979) 23 Cal.3d 208, 214, fn. 4), warranting "reversal only if it is reasonably probable the trial outcome was affected."

---

[4] Although appellant labels the alleged error as "misconduct," "'[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

(*Shazier, supra*, at p. 127.) Accordingly, to prevail on a claim of prosecutorial error based on remarks to the jury, a defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*Jablonski, supra*, at p. 835.)

During closing argument, the prosecutor stated that appellant "had [GSR] on his person." Appellant's attorney objected on the ground that the evidence at trial had merely established that particles *consistent with* GSR—i.e., only two of the three elements that are *characteristic of* GSR—had been found on appellant's shorts. Defense counsel added "I believe the [PowerPoint] slide says it tested positive for [GSR] . . . . Absolutely he can argue consistent with." The trial court agreed the prosecutor could argue that particles consistent with GSR had been found and told the prosecutor "to made sure your [PowerPoint] slide is clear about that too." The court then told the jury "[t]he statement it's consistent with [GSR] is appropriate for argument sake."

During his rebuttal, the prosecutor stated: "The next theory they put forth . . . is that the particle[s] consistent with [GSR] that were located on the shorts, must have come from some [sort] of contamination. And they spent a bunch of time walking through the interview room and who touched what, and who touched where. What is of significance is all those gloves touched [appellant's] hands, but his hands came back with zero [GSR] particles. The only place there was [GSR] was the right front short." After the court sustained defense counsel's objection that the prosecutor had once again misstated the evidence, the prosecutor stated "[t]he only place there was [*sic*] particles consistent with [GSR] was the defendant's right front short."

12

Later, the prosecutor stated "you have the fact that several particles *characteristic of* [GSR] were located on the defendant's shorts." (Italics added.) After defense counsel objected, the court told the prosecutor "[r]ephrase that one more time." The prosecutor then stated "that several particles, characteristics of [GSR] were located on the defendant's short." Defense counsel once again objected that the prosecutor had misstated the evidence. The court overruled the objection. A PowerPoint slide the prosecutor introduced during his closing argument stated that "Defendant had [GSR] on his shorts," while another slide introduced during the rebuttal closing argument stated that appellant was the "Only person with [GSR] on his clothing"

Appellant fails to demonstrate it is reasonably probable that the prosecutor's misstatements regarding the GSR evidence affected the outcome of his trial. The jury was instructed prior to both opening statements and closing arguments that "[n]othing the attorneys say is evidence. In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence." We presume the jury understood and followed these instructions. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

The evidence at trial made clear the distinctions between particles *commonly associated with* GSR (either lead, antimony, or barium), particles *consistent with* GSR (two of the three), and particles *characteristic of* GSR (all three). The evidence also made clear that only particles *consistent with* or *commonly associated with* GSR were found on appellant's shorts. As defense counsel emphasized to the jury, no particles characteristic of GSR were found and the criminalist testified that "two particles alone [i.e., particles consistent with GSR] are

13

not indicative of [appellant having fired or] handled a firearm." In light of this, it is not reasonably probable the jury found that particles characteristic of GSR (rather than particles consistent with GSR) were found on appellant's shorts. As we have previously noted, the independent evidence of appellant's guilt was also strong. (See *ante*, p. 11.) Appellant's claim of prosecutorial error thus fails. (*Shazier*, *supra,* 60 Cal.4th at p. 127.)

## III.

### *Refusal Of Instruction on Lack of Motive (CALCRIM No. 370)*

Appellant finally contends the trial court erred in declining his request to instruct the jury on lack of motive pursuant to CALCRIM No. 370.[5] Our Supreme Court has held, however, that the trial court does not err by refusing such an instruction. (*People v. Romo* (1975) 14 Cal.3d 189, 196 ["even if [instructions on motive are] requested, it has been held not to be error to refuse such instructions"]; *People v. Bermijo* (1935) 2 Cal.2d 270, 278; *People v. Wilkins* (1910) 158 Cal. 530, 536-537.) We are bound to follow this authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## IV.

### *Cumulative Error*

Appellant finally contends that the cumulative effect of the alleged errors compels reversal of his conviction. Because

---

[5] CALCRIM No. 370 states: "The People are not required to prove that the defendant had a motive to commit [murder]. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

14

appellant has not demonstrated error, there is no error to cumulate.  (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 32.)

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


CODY, J.

15

Patricia Kelly, Judge

Superior Court County of Santa Barbara

_____

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Seth McCutcheon, Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.